PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

ANDREW PAULSON (CABN 267095)
SAILAJA PAIDIPATY (NYBN 5160007)
Assistant United States Attorneys

     1301 Clay Street, Suite 340S
     Oakland, California 94612
     Telephone: (510) 637-3680
     FAX: (510) 637-3724
     andrew.paulson@usdoj.gov
     sailaja.paidipaty@usdoj.gov

Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br> v.<br><br>DARRELL WAYNE SMITH,<br>    a/k/a "Dirty Dick Smith"<br><br>    Defendant. | CASE NO. 4:23-cr-00110-YGR<br><br>UNITED STATES' TRIAL BRIEF |

The government submits this trial memorandum for the Court's assistance in the trial of this matter, which is scheduled to begin March 17, 2025.

## I.    The Superseding Indictment

On July 25, 2024, a grand jury returned a superseding indictment charging Smith with six counts of sexual abuse of a ward, in violation of 18 U.S.C. § 2243(b); seven counts of abusive sexual contact, in violation of 18 U.S.C. § 2244(a)(4); one count of aggravated sexual abuse, in violation of 18 U.S.C. § 2241(a); and one count of deprivation of rights under color of law, in violation of 18 U.S.C. § 242. These charges stem from Smith's sexual abuse of five female prisoners—Shayla (Counts One through Six), Lea (Counts Seven through Nine), Claudia (Counts Ten through Thirteen), Lisa (Count Fourteen), and Fabiola (Count Fifteen)—while he was a correctional officer at FCI Dublin.

## II.    The Evidence[1]

From February 2015 until October 2017, Smith worked as a correctional counselor at FCI Dublin. As a correctional counselor, Smith primarily worked in the housing units and was responsible for implementing programs within the unit to assist prisoners with their individual needs, including ensuring access to individual and group counseling services.  From October 2017 to December 2021, he worked as a correctional officer.  In that role, Smith performed duties related to detention, correctional supervision, protection, and control and accountability of the inmates.  He frequently worked inside the housing units, and sometimes at night.

### A.    Abuse of Shayla (Counts One Through Six)

In 2019, Smith began asking Shayla personal questions that quickly became sexual.  He told her that he "wanted her pussy," that he liked small breasts, and that he wanted to "lick her from her belly button to her butthole."  Smith also liked feet and would ask Shayla to show him her feet.  Whenever she wore slippers, Smith would comment on her feet.  Smith also told Shayla that he would put money on her books and buy her a car when she was released from prison.  Smith repeatedly asked if he could touch her or if he could see her naked—requests that Shayla rebuffed.  One night in March or April 2021, Smith kissed Shayla inside her cell.

---

[1] The evidence in this section is based on how the government anticipates the witnesses will testify at trial.

As discussed below, between May 2019 and May 2021, Smith touched Shayla on multiple occasions. Shayla did not report these incidents at the time because she was afraid of getting in trouble because Smith had caught her with an Altoids box with beads that she used for crafting, which is considered contraband. He frequently reminded her that he could write her up if he wanted to, which scared her and deterred her from reporting the abuse.

*Count One*: Between May 2019 and August 2020, Smith entered Shayla's cell and asked her if he could touch her. Shayla told him to get out. Smith then pulled her socks off her feet and said, "Those are nice." He then touched Shayla's buttocks outside of her clothing.

*Count Two*: Between October 2020 and March 2021, Smith entered Shayla's cell again. As they were standing in the cell, Smith touched her buttock.

*Count Three*: Between April and May 2021, Shayla was in her in cell sitting cross-legged on her bed. Smith again entered her cell and slid his hands up the opening of her shorts towards her thigh and crotch area. Shayla pushed Smith's hands away and he left.

*Count Four*: A few days after the incident charged in Count Three, Smith again entered Shayla's cell and put his hand under her shorts and underwear and touched her crotch and vaginal area. She reacted by pushing him out of her room. He laughed and left.

*Counts Five and Six*: Shortly thereafter on the same day, Smith returned to Shayla's cell. She was standing facing her locker when Smith grabbed Shayla's right hand and tried to turn her towards him. Shayla struggled against him and ended up pinned against the wall between the bed and her locker with her back against the wall. Shayla tried to fight Smith off, but he was stronger than her and she could not escape. While pinning her against the wall, Smith put his hand down Shayla's pants and underwear and used his fingers to spread her buttocks apart. He then put a finger inside her anus. Smith also touched Shayla's vagina. Shayla yelled "No," and Smith stopped and left her cell.

### B.    Abuse of Lea (Counts Seven Through Nine)

Lea met Smith when she was housed in A-Unit. Smith initiated conversations with Lea that eventually escalated to sexual comments about her buttocks. When Lea was transferred to C-Unit, Smith began entering her cell when she was alone, brushing up against her, and eventually grabbing her buttocks.

*Count Seven*: Between March and June 2020, Lea approached Smith and told him to leave her

alone because she had a girlfriend.  Smith laughed and asked if he could watch Lea and her girlfriend have sex.  Smith then followed Lea back to her cell and instructed her to take off all her clothes and bend over.  Lea took off her shorts and t-shirt and bent over.  Smith then inserted two fingers into Lea's vagina.

*Count Eight*: Between August and December 2020, when Lea was working in the laundry room early in the morning, Smith approached her and told her to bend over one of the laundry machines.  She did as she was told.  Smith then put his hands in her pants and digitally penetrated her vagina.

*Count Nine*:  Between September 2020 and January 2021, Smith again approached Lea in the laundry room and again instructed her to bend over the laundry machine.  She did, and Smith put his hands inside her pants and digitally penetrated her vagina.

### C.    Abuse of Claudia (Counts Ten Through Thirteen)

Claudia first met Smith when she was housed in A-Unit.  About a month after she was transferred to C-Unit, Smith began coming into her cell and talking to her.  In June or July 2020, Claudia's father died, and she was depressed, causing her to stay in bed frequently.  Smith would enter her cell, spank her on her buttocks, and tell her to walk around for him.  Around that time, Smith began withholding Claudia's mail from her husband and would not allow her to call her husband.  Smith told Claudia that she had "a lot to gain" from him.  Smith also told her that if she was good to him, he would stay in contact with her after she was released and give her money.

*Count Ten*: Between September 2020 and January 2021, Smith told Claudia to meet him in the laundry room after evening count and he would give her a cellphone so she could have a video visit with her kids.  She complied.  When she got to the laundry room, Claudia asked Smith about the video visit, and Smith told her that she had to cooperate with him first.  At that point, Smith put his hands on Claudia's breasts and buttocks.  She tried to push Smith away and pull his hands off her, and she told him she didn't want to engage with him.  Smith smiled at her and told her she was going to "relax" and "give [him] what [he] want[s]."

*Count Eleven*: About a week after the first incident, Smith told Claudia to meet him in the laundry room again.  Claudia met him in the laundry room because she was still hoping to get a cellphone so she could see her kids.  When she met Smith in the laundry room, he pulled black lingerie underwear out of his pocket and told her to model it for him.  When Claudia asked for a cellphone in exchange, Smith

laughed and said she needed to earn it. Claudia then did what she was told and took off all of her clothes and put the lingerie on. Smith then grabbed her, pulled the bra down and started to kiss her breasts. He then put her on the dryer and kissed her legs and licked her toes. As he was licking her toes, he unzipped his pants and began masturbating. At the same time, he placed his fingers inside her vagina. Afterwards, Smith told Claudia she was a "good girl."

*Count Twelve*: Between September 2020 and January 2021, Smith again told Claudia to meet him in the laundry room and she would not get in trouble. Claudia complied. When she arrived, she told him that she wanted to stop what was going on between them. Smith responded that she had no choice, and it would not stop until he wanted it to stop. During that interaction, Smith held Claudia close to him and groped her buttocks and breasts.

*Count Thirteen*: On a separate occasion between September 2020 and January 2021, Smith and Claudia were in a janitor's closet in her housing unit. Lisa stood outside to serve as a lookout in exchange for Smith promising to give her Maybelline makeup. While in the closet, Claudia told Smith that she wanted him to leave her alone, and he told her to just cooperate with him. He then instructed her to pull her pants down and turn around. She did as Smith instructed, and she saw that Smith had put a condom on his penis. Smith then inserted his penis into Claudia's vagina and had intercourse with her. After this incident, Smith offered to give Claudia a MAC eye shadow palette, but she refused to accept it.

On a different occasion after this incident, Smith grabbed Claudia by the waist and pulled her into the laundry room. Smith attempted to pull her close, and Claudia struggled to get away. She told him that she was done, and she refused to do anything with him anymore. Lisa saw Smith grab Claudia and go into the laundry room, and she stood outside and acted as a lookout.

### D.     Abuse of Lisa (Count Fourteen)

In 2020 during the COVID lockdown, Smith locked inmates in their cells and would only unlock the cells if the inmates inside flashed him. Several inmates will testify to this. On two occasions, Smith locked Lisa's cell door and only unlocked it after she showed him her breasts. The first time, another inmate lifted Lisa's shirt, and the second time Lisa lifted her own shirt. On two other occasions, Smith entered Lisa's cell, put his hands on her waist, and pulled her close to his body. One of those times, Smith tried to get Lisa to go with him to the janitor's closet.

*Count Fourteen*: Between December 2020 and March 2021, Smith locked Lisa in her cell and told her, "Let me see." After Lisa flashed her breasts at Smith, he unlocked the door and walked into her cell. Smith then used both hands to touch Lisa's breasts under her shirt while trying to kiss her. Lisa turned her face away as Smith tried to kiss her and Smith's tongue touched the side of Lisa's cheek.

### E.    Abuse of Fabiola (Count Fifteen)

Smith frequently asked Fabiola to flash her breasts to him when she was alone in her cell—an instruction she obeyed on approximately four occasions. One time, Fabiola snuck out of her cell just before count to get hot water for coffee. Smith followed her and stood blocking the doorway so she could not get out of the room where the hot water was. He told Fabiola, "Let me see," while he looked at her breasts. Fabiola told him no and to let her go back to her room. Smith then shut and locked the door and stood waiting until Fabiola lifted her shirt and bra and flashed her breasts at him. Once she did, he unlocked the door and let her out.

*Count Fifteen*: One morning between August and November 2016, Fabiola was asleep in her bed on the bottom bunk alone in her cell wearing a nightgown and underwear under her covers. Everyone else in the unit had either left for work already or was still asleep. Fabiola awoke to Smith's hands touching between her thighs and moving towards her vagina. At the time, Smith was standing over her inside her cell. Still groggy and confused from sleep, Fabiola sat up in bed. At that point, Smith stuck two of his fingers inside her vagina. Once Fabiola was more alert and awake and realized what was going on, she told Smith to get out, and he left. After returning to the unit later that day, Fabiola passed Smith who was in the officer's station. When she walked by and Smith saw her, he placed his index and middle fingers to his mouth and smelled his fingers. He then placed his tongue between his two fingers.

### F.    Abuse of Uncharged Victims Celia, Cassandra, and Lincy

*Celia* witnessed Smith harassing Shayla on various occasions, including one time at night when Smith summoned Shayla to the officer's station and appeared to engage in sexual activity with her inside the office. In addition to corroborating Shayla, Celia will also testify that Smith caught Celia out of bed one night but still in her cell. She asked if Smith was going to give her a "shot" (disciplinary paperwork). He responded that he wouldn't, and that it was the start of a "great friendship." After that, Smith began touching Celia, once in the officer's station when he forced her to bend over in front of him and he grabbed

her breast, and another time when she awoke with Smith in her cell touching her body under her clothes, including her breasts, buttocks, and vagina.

*Cassandra* will provide testimony corroborating an incident when Smith caused Claudia to spill hot water on herself. She will also corroborate another incident when Smith locked Cassandra and Claudia in a cell together with other inmates and demanded that they flash him. Cassandra will further testify that Smith locked her in a cell on multiple occasions and demanded that she flash him in order to be let out. Finally, she will testify that on multiple occasions, Smith entered her cell and digitally penetrated her vagina. On one of those occasions, Smith asked if he could digitally penetrate her anus. When she said no, he did it anyway.

*Lincy* will testify that Smith tried to get her to flash her breasts several times, and that on multiple occasions Smith entered her cell and tried to touch her. On at least one occasion, Lincy awoke with Smith inside her cell. On another, Lincy awoke with Smith inside her cell touching her vagina under her clothes.

### G.    Surveillance Video

As discussed in more detail above, several prisoners will testify that Smith entered their cells while they were inside alone or with other inmates. Indeed, much of the sexual abuse that will be discussed at trial occurred inside the cells where the inmates lived. In addition to the testimony of these witnesses, the government will introduce surveillance footage from FCI Dublin showing Smith entering the cell of an inmate named Manuela while she was alone inside it on October 2, 2021. Manuela will testify that Smith opened her cell door, came inside, asked her if she had a girlfriend, and then asked if she wanted to see his tattoo "down there." The surveillance video also shows another inmate watching Smith as he stands at the threshold of Manuela's cell. Once Smith enters, the video shows this inmate walk down the hall, stop at the threshold of the door, and talk to Smith who at that point was inside the cell. Manuela will testify that the other inmate came to the door and told Smith that he could not be in the cell, and that Smith responded that he could do whatever he wanted. Smith then laughed and walked out of the cell.

### H.    Smith's Website Views and Internet Searches

The government intends to call FBI Digital Forensics Examiner (DFE) Michael Kan as an expert in digital forensics. As discussed in his expert report (Exh. 278), DFE Kan analyzed the contents of Smith's iPad, which was seized at his house on May 11, 2023. On the iPad was a database that stored

web history artifacts showing what websites Smith visited and what internet searches he ran. Of the approximately 52,000 web pages in the database, approximately 6,000 visits were to pornography websites. The database also contained time stamps for these views and searches, though the timestamps do not uniquely associate a timestamp to every individual webpage visit. Instead, the database logs a timestamp corresponding to the most recent visit to a particular site. For example, the database has a timestamp of August 18, 2021, for the pornography website Xvideos. That means that the last time Smith visited Xvideos was on August 18, 2021. All the timestamps for the pornography websites range from October 26, 2018, to August 18, 2021.[2] The majority of the Google searches have dates in 2022. As the expert report details, Smith's iPad was set up on November 18, 2014.

Of the approximately 6,000 visits to pornography websites, DFE Kan isolated five categories of website views/searches that are relevant to this case, only three of which the government intends to admit in its case in chief.[3]

**_Nonconsensual/Unwanted Anal Sex_**: There were 84 visits/searches that involved materials related to nonconsensual or unwanted anal sex (Exh. 282). These visits ranged from on or before October 26, 2018, to on or before August 18, 2021, for the pornography websites, and July 30, 2022, for the Google searches. The materials include things such as "forced deep anal," "sudden anal attack on thai escort," and "guy shoves dick in ass after she says dont fuck my butthole." Additionally, as DFE Kan will testify, certain database entries indicate that Smith searched for a particular topic and then viewed successive pages of results. For instance, on or before August 18, 2021, Smith visited the pornography website "Xvideos" and searched for "accidental anal forced bondage" using the site's search function. The database indicates that he then looked at the second, third, and fourth pages of results for that search term.

**_Feet_**: There were 2,713 visits/searches that involved materials related to feet and/or toes

---

[2] Smith worked at FCI Dublin from February 8, 2015, until December 18, 2021. All the acts charged in the Superseding Indictment occurred between 2019-2021, except for Count Fifteen, which occurred between approximately August and November 2016.

[3] In addition to the three categories discussed here that the government intends to discuss in its case in chief, Smith also visited three websites related to rape and three that related to sex and showers, including one titled "Anne Heche naked shower scene Girls In Prison 2." There were also 13 website views/searches for a particular FCI Dublin inmate. At this time, the government does not intend to call that inmate as a witness or introduce evidence related to that inmate in its case in chief. As a result, the government does not intend to admit these searches in its case in chief.

(Exh. 283).  All the visits to pornography and other similar websites ranged from on or before October 26, 2018, to on or before August 18, 2021.  The Google visits/searches occurred on or before July 30, 2022, while one Pinterest view occurred on or before July 31, 2022.  The materials include things such as "feet sex," "very long sexy toes," and "assfucking and footworship on the job."  It also includes searches such as "billie eilish feet," where Smith clicked through 236 of the thumbnail images that populated from that search.  It also shows that Smith visited websites such as "Wikifeet" and "Ffetish.photos" (*i.e.*, foot fetish photos).

*Sleeping/Unconscious*: There were 13 website views involving the sexual assault of sleeping or unconscious women (Exh. 286).  All the visits were to pornography websites and occurred from on or before September 20, 2019, to on or before August 18, 2021.  The materials include things such as "Anal Abuse Of Passed Out Girl," "sleeping bitch gets throatfucked," and "masturbate and cum on sleeping brunette."

## III.     Legal Analysis and the Elements

### A.     Counts One Through Four, Ten, Twelve, and Fourteen: 18 U.S.C. § 2244(a)(4) (Abusive Sexual Contact)

The elements of 18 U.S.C. § 2244(a)(4) that the government must prove beyond a reasonable doubt are: (1) the defendant knowingly engaged in sexual contact with the victim; (2) at the time the victim was in official detention at FCI Dublin; and (3) at the time, the victim was under the custodial, supervisory, or disciplinary authority of the defendant.  "Sexual contact" means the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.  18 U.S.C. § 2246(3).  "Official detention" means detention by a federal officer or employee, or under the direction of a federal officer or employee, following a charge or conviction of an offense.  18 U.S.C. § 2246(5).

There is no dispute that any of the charged victims were in official detention at FCI Dublin and that they were under the custodial, supervisory, or disciplinary authority of Smith.  The only contested facts will be whether the charged sexual contacts occurred.

**B.    Counts Seven Through Nine, Eleven, Thirteen, and Fifteen: 18 U.S.C. § 2243(b) (Sexual Abuse of a Ward)**

The elements of 18 U.S.C. § 2243(b) that the government must prove beyond a reasonable doubt are: (1) the defendant knowingly engaged in a sexual act with the victim; (2) at the time, the victim was in official detention at FCI Dublin; and (3) at the time, the victim was under the custodial, supervisory, or disciplinary authority of the defendant.  In this case, "sexual act" means either: (i) contact, meaning penetration, however slight, between the penis and the vulva or the penis and the anus, or (ii) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person. 18 U.S.C. § 2246(2).

As with the abusive sexual contacts discussed above, there is no dispute that the victims were in official detention at FCI Dublin and that they were under the custodial, supervisory, or disciplinary authority of Smith.  The only contested facts will be whether the charged sexual acts occurred.

**C.    Count Five: 18 U.S.C. § 2241(a) (Aggravated Sexual Abuse)**

The elements of 18 U.S.C. § 2241(a) that the government must prove beyond a reasonable doubt are: (1) on a date between on or about April 1, 2021, and on or about May 31, 2021, the defendant knowingly used force to cause Shayla to engage in a sexual act and (2) the offense was committed at FCI Dublin.  Here, "sexual act" means the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.  18 U.S.C. § 2246(2).

Like the other counts, there is no dispute that the offense occurred at FCI Dublin.  The only factual dispute will be whether Smith knowingly used force to cause Shayla to engage in a sexual act.  The requirement that Smith used force may be satisfied if the government shows that he used force "sufficient to overcome, restrain, or injure a person."  *United States v. Fulton*, 987 F.2d 631, 633 (9th Cir. 1993) (internal quotations omitted).  In other words, "[T]he force requirement is met when the 'sexual contact resulted from a restraint upon the other person that was sufficient that the other person could not escape the sexual contact.'"  *Id.* (quoting *United States v. Fire Thunder*, 908 F.2d 272, 274 (8th Cir. 1990)).  Here, Shayla will testify that Smith grabbed Shayla's right hand, pinned her against the wall, and digitally

1    penetrated her anus as she unsuccessfully tried to fight him off.  She will testify that Smith was stronger

2    than her and was therefore able to overpower her resistance and digitally penetrate her anus.

3    **D.    Count Six: 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law)**

4    The elements of 18 U.S.C. § 242 that the government must prove beyond a reasonable doubt are:

5    (1) on a date between on or about April 1, 2021, and on or about May 31, 2021, the defendant was acting

6    under color of law; (2) during that time, the defendant deprived Shayla of her right not to be subject to

7    cruel and unusual punishment, which is a right secured and protected by the Constitution; (3) the defendant

8    acted willfully, meaning he intentionally deprived Shayla of this right; (4) the offense involved aggravated

9    sexual abuse or attempted aggravated sexual abuse; and (5) at the time, Shayla was present in the Northern

10    District of California.

11    As with the other counts, there is no real dispute that Smith was acting under color of law when

12    he was a correctional officer at FCI Dublin, that the right of a prisoner to be free from sexual abuse or

13    sexual conduct by a guard is a right that is secured by the Eighth Amendment, or that Shayla was in the

14    Northern District of California at the alleged time.  The only factual dispute will be whether the aggravated

15    sexual abuse charged in Count Five occurred.  If the government proves that it did occur, all the elements

16    of this offense will also be satisfied.

17    **E.    Anticipated Trial Issues**

18    **1.    Admissibility of Prior Consistent Statements**

19    Pursuant to Federal Rule of Evidence 801(d)(1)(B), a statement is not hearsay if (1) the declarant

20    testified and is subject to cross-examination about a prior statement; (2) the statement is consistent with

21    the declarant's testimony; and (3) the statement is offered to rebut an express or implied charge that the

22    declarant recently fabricated it or acted from a recent improper influence or motive in so testifying or to

23    rehabilitate the declarant's credibility as a witness when attacked on other grounds.  Fed. R. Evid.

24    801(d)(1)(B).

25    Defendants in sexual abuse cases routinely argue that victims fabricated their testimony or were

26    influenced by an improper motive.  This case is no exception.  The government anticipates that Smith may

27    argue that the victims in this case fabricated their testimony to obtain immigration benefits, for financial

28    gain, or to otherwise obtain a benefit from the government.  To the extent that Smith makes these

1    arguments, the government should be permitted to introduce the victims' prior consistent statements

2    previously made to other witnesses that are consistent with their in-court testimony.

3         **2.    Admissibility of Statements Made for Medical Diagnosis or Treatment**

4         Pursuant to Federal Rule of Evidence 803(4), statements made for medical diagnosis or treatment

5    are exceptions to the rule against hearsay.  To qualify, these statements must (1) be made for, and

6    "reasonably pertinent to," medical diagnosis or treatment and (2) describe medical history, past or present

7    symptoms or sensations, their inception, or their general cause.  Fed. R. Evid. 803(4).  These statements

8    are admissible because "[a]n individual seeking medical care is unlikely to lie about her medical history

9    or symptoms because she knows that 'a false statement may cause misdiagnosis or mistreatment.'"  *United*

10   *States v. Kootswatewa*, 893 F.3d 1127, 1132 (9th Cir. 2018) (quoting *White v. Illinois*, 502 U.S. 346, 356

11   (1992)).  Moreover, they are admissible as substantive evidence regardless of whether the declarant is

12   available to testify.  *Id.*; *see also United States v. Latu*, 46 F.4th 1175, 1179-80 (9th Cir. 2022) (statements

13   made to medical doctor following prison assault were admissible as substantive evidence even though the

14   declarant victim did not testify at trial).  For example, the Ninth Circuit has ruled that statements to a nurse

15   during a sexual assault examination, including those that describe the underlying sexual assault, "fall

16   comfortably within the scope of Rule 803(4)" and are admissible.  *Kootswatewa*, 893 F.3d at 1132; *see*

17   *also United States v. Newman*, 965 F.2d 206, 210 (7th Cir. 1992) (statements to psychologist fit within

18   Rule 803(4)).

19        In this case, after some of the victims reported Smith's abuse to officials at BOP, the victims

20   underwent various evaluations by doctors, nurses, and psychologists pursuant to the requirements of the

21   Prison Rape Elimination Act (PREA).  For example, on or about July 25, 2022, Fabiola reported Smith's

22   abuse to officials at FCI Dublin.  The next day, psychologist Dr. Michael Hoang conducted a

23   psychological evaluation of Fabiola (Exh. 119-11).  As Dr. Hoang will testify, the purpose of this

24   evaluation was to diagnose any psychological injuries Fabiola may have suffered because of Smith's abuse

25   and to prescribe an appropriate course of treatment.  To do this, Dr. Hoang had to determine what

26   happened to Fabiola.  The statements Fabiola made during that evaluation, and the write-up Dr. Hoang

27   completed during and immediately after that evaluation, are thus admissible under Rule 803(4).[4]

28
_____
[4] To the extent Dr. Hoang testifies that he cannot remember the exact meeting with Fabiola because

### 3.    Use of Interview Reports for Impeachment Purposes

Most of the government's witnesses did not give prior statements that were memorialized verbatim. However, federal law enforcement agents interviewed every witness, and those agents summarized the interviews in reports. These summaries are not equivalent to a witness's actual statements. *See United States v. Severson*, 49 F.3d 268, 271-72 (7th Cir. 1995); *United States v. Schoenborn*, 4 F.3d 1424, 1427 (7th Cir. 1993) (explaining that a third party's characterization of a statement is not the same as an actual prior statement, unless the witness subscribed to that characterization). To the extent any of the government's witnesses testify inconsistently with an agent's report, the witnesses cannot properly be impeached using an agent's report because the agents' reports are not the equivalent of the witness's own statements. *See United States v. Bao*, 189 F.3d 860, 866 (9th Cir. 1999) ("Only the declarant of the prior inconsistent statement, and not another witness, may be impeached with the statement."); *Bemis v. Edwards*, 45 F.3d 1369, 1372 (9th Cir. 1995) ("Whereas an inconsistent statement by a testifying witness can be used to impeach that witness's credibility, an inconsistent account by another source is offered to show an alternative view of the truth."); *United States v. Leonardi*, 623 F.2d 746, 757 (2d Cir. 1980) (holding that witness could not be impeached with FBI agent's statements where witness had not subscribed to statements and the interview did not purport to memorialize all of the witness's statements).

### 4.    Inadmissibility of Evidence of the Defendant's Good Character

Federal Rule of Evidence 404(a)(1) generally prohibits the introduction of evidence of the defendant's character to prove that the person acted in conformity therewith on a particular occasion. Such evidence is admissible only if it relates to a "pertinent" or relevant character trait. Fed. R. Evid. 404(a)(2)(A). There is no character trait that is pertinent to whether Smith sexually abused the victims in this case, who could not legally consent to any sexual conduct at FCI Dublin. Even if the court determines

---

he was conducting so many similar PREA evaluations at that time, his clinical note would still be admissible as a recorded recollection because, as Dr. Hoang will testify, he completed notes such as that in Exhibit 119-11 within a few hours of the evaluation and before seeing another patient. *See* Rule 803(5) (exception to hearsay applies to a record that "(A) is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately; (B) was made or adopted by the witness when the matter was fresh in the witness's memory; and (C) accurately reflects the witness's knowledge.").

1   that evidence of a pertinent character trait is admissible, Federal Rule of Evidence 405(a) limits such

2   evidence to "testimony about the person's reputation or by testimony in the form of an opinion," and any

3   character witness should not be permitted to testify about specific instances of good conduct.  Of course,

4   if the defendant is permitted to introduce any character evidence, the government should be permitted to

5   admit otherwise inadmissible character evidence to rebut the evidence introduced by the defendant.  *See*

6   *United States v. Mendoza-Prado*, 314 F.3d 1099, 1105 (9th Cir. 2002).

7              **5.    Inadmissibility of the Defendant's Self-Serving Hearsay**

8              It is well-established that a defendant's statement can only be introduced by the government, and

9   not by the defendant, as an admission by a party-opponent.  Fed. R. Evid. 801(d)(2).  The rule does not

10  require that the statement actually be an admission or that it be inculpatory.

11             As discussed above, Smith made multiple statements, both verbally to the women he abused and

12  to other corroborative witnesses.   The government may choose to introduce all or some of Smith's

13  statements in its case-in-chief.  If that should happen, Smith is precluded from eliciting or introducing his

14  own statements through any witness, whether on direct or cross-examination, as such statements constitute

15  inadmissible hearsay.  Fed. R. Evid. 801(c); *United States v. Nakai*, 413 F.3d 1019, 1022 (9th Cir. 2005)

16  (holding that the defendant's attempt to elicit his own statements from a witness was "inadmissible

17  hearsay").

18             **6.    Inadmissibility of Rule Violations by Inmates Unless They Involve Specific
                       Instances of Untruthfulness**

19

20             Federal Rule of Evidence 608(b) permits a party on cross-examination to ask a witness about

21  specific instances of untruthful conduct.  These specific instances, however, must actually be probative of

22  truthfulness.  *United States v. Nelson*, 365 F. Supp. 2d 381, 386 (S.D.N.Y. 2005) ("The rule does not

23  authorize inquiry on cross-examination into instances of conduct that do not actually indicate a lack of

24  truthfulness.") (quoting Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* §

25  608.22[2][c][i] (2d ed. 1997)).  Moreover, a party may not offer extrinsic evidence related to the prior act

26  but are instead "stuck" with the witness's answer.  *United States v. Brooke*, 4 F.3d 1480, 1484 (9th Cir.

27  1993).  Even if evidence is admissible under Rule 608(b), the Court must still conduct a Rule 403

28  balancing to ensure its probative value is not significantly outweighed by the danger of unfair prejudice,

1   confusion of the issues, misleading the jury, or wasting time. *United States v. Olsen*, 704 F.3d 1172, 1184

2   n.4 (9th Cir. 2013) ("Rule 608(b) of the Federal Rules of Evidence authorizes courts to permit inquiry into

3   specific instances of conduct during cross-examination if they are probative of the character for

4   untruthfulness of the witness—subject, of course, to the balancing analysis of Rule 403.").

5       In this case, Rule 608(b) prevents the defense from inquiring on cross-examination into prison

6   infractions (sometimes referred to as "shots") or other specific acts that do not bear on a witness's veracity,

7   such as drug use, acts of violence, or sexual activities with other inmates (this would also be prohibited

8   under Rule 412). *See United States v. Collins*, 90 F.3d 1420, 1429 (9th Cir. 1996) (upholding trial court's

9   denial of cross-examination into witness's drug dealing as it was not probative of veracity); *United States*

10  *v. Dickens*, 775 F.2d 1056, 1058 (9th Cir. 1985) (affiliation with a group engaged in criminal activity was

11  not probative of truthfulness and therefore inadmissible under Rule 608(b)); *United States v. Hinton*, 31

12  F.3d 817, 824 (9th Cir. 1994) (evidence of witness's parenting practices and drinking habits not probative

13  of truthfulness); *United States v. Sellers*, 906 F.2d 597, 602 (11th Cir. 1990) ("[P]rior instances of drug

14  use are not relevant to truthfulness for purposes of Fed.R.Evid. 608(b)."); *United States v. Nelson*, No. 17-

15  CR-00533-EMC-1, 2024 WL 1244262, at *36 (N.D. Cal. Mar. 11, 2024) ("But generally an act of violence

16  . . . is not probative of truthfulness."); *Tapp v. Tougas*, No. 905CV1479NAMDEP, 2018 WL 1918605, at

17  *4 (N.D.N.Y. Apr. 20, 2018) (prohibiting cross-examination into prison infractions such as

18  "bribery/extort[ion]" that were not probative of character for truthfulness); *Jeanty v. Cerminaro*, No.

19  616CV00966BKSTWD, 2021 WL 2778572, at *6 (N.D.N.Y. July 2, 2021) (prison disciplinary infraction

20  for doing legal work for another inmate without permission was not probative of veracity); *Lewis v. Velez*,

21  149 F.R.D. 474, 481 (S.D.N.Y. 1993) (prison infractions for setting trash can on fire, throwing liquid at a

22  nurse and a doctor, and fighting with another inmate were inadmissible because they did not "reflect

23  dishonesty or deceit").   The defense should therefore be precluded from inquiring into a witness's

24  disciplinary infractions unless they are able to show that the infractions are actually probative of

25  truthfulness and that the probative value is not substantially outweighed by the factors listed in Rule 403.

26  ///

27  ///

28  ///

1   DATED:  February 21, 2025                              Respectfully submitted,

2                                                          PATRICK D. ROBBINS
                                                           Acting United States Attorney
3

4                                                          */s/ Andrew Paulson*
                                                           ANDREW PAULSON
5                                                          SAILAJA PAIDIPATY
                                                           Assistant United States Attorneys
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28