CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

ANDREW PAULSON (CABN 267095)
SAILAJA M. PAIDIPATY (NYBN 5160007)
Assistant United States Attorneys

    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3680
    FAX: (510) 637-3724
    andrew.paulson@usdoj.gov
    sailaja.paidipaty@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 23-110 YGR |
| Plaintiff, | **UNITED STATES' SUBMISSION ON ORDER TO SHOW CAUSE** |
| v. | |
| DARRELL WAYNE SMITH, a/k/a "Dirty Dick Smith" | Hon. Yvonne Gonzalez Rogers |
| Defendant. | |

## I. INTRODUCTION

The United States of America respectfully submits this briefing for the Court's consideration of the pending Order to Show Cause regarding contribution or reimbursement of attorney's fees by Defendant Darrell Smith. *See* Dkt. 238.

Documents reviewed by the government to date and attached here suggest that both before and after his indictment in the above-captioned case, Defendant took steps to shield and safeguard assets from potential civil lawsuits and criminal sanctions resulting from sexual abuse allegations from his time as a correctional officer at FCI Dublin.

The materials submitted comprise documents that the government has collected and reviewed to

date.  The government's investigation is ongoing.

## II. PROCEDURAL POSTURE

Following Mrs. Smith's testimony at the end of the defense's case-in-chief, this Court issued an Order to Show Cause regarding contribution/reimbursement for his attorney's fees.  *See* Dkt. 238.  During cross-examination, the government questioned Mrs. Smith regarding numerous property transfers from the Defendant's name into Mrs. Smith's name or from joint ownership between the Smiths into Mrs. Smith's name alone.  Trial Tr. Vol XI, 1939:15 – 1948:8.

After Mrs. Smith's testimony, the government received from the Court the financial affidavit filed by the Defendant during his Rule 5 appearance on May 11, 2023, the day of his arrest in the Northern District of Florida.

Prior to a status conference on September 24, 2025, the Defendant provided materials to the Court *ex parte* and under seal in response to the OSC.  The government provided a brief proffer of some of the documents it had reviewed to date and indicated that it would continue its work and submit documents to the Court prior to the next hearing on October 7, 2025.  *See* Dkt. 262, Minute Entry.

## III. GOVERNMENT'S DOCUMENT REVIEW

Since the Court issued the OSC, the government has reviewed financial documents already in its possession from the underlying investigation, additional financial records obtained in response to the OSC, text messages located on the Defendant's phone that was seized upon arrest, screenshots saved on the Defendant's phone, and public property and family court records.  Below, the government summarizes its findings based on those materials and attaches the source documents for the Court's consideration.

**A.  Defendant Knew Inmates Had Accused Him of Sexual Abuse Nearly One Year Before His Arrest.**

Based on records reviewed to date, the Defendant learned that several inmates had accused him of sexual abuse well before he was charged criminally.  In June 2022, eleven months prior to the Defendant's arrest, a reporter at KTVU, a local Bay Area news channel, contacted the Defendant regarding allegations by two former FCI Dublin inmates, Marie and Linda.  Attached at Exhibit 3.  The reporter indicated that she had spoken with the women "about abuses they say they've incurred at your

hands." *Id.* The email attached a link to a file-sharing website that contained a copy of a tort claim filed with the BOP by Marie. *Id.* The reporter asked for the Defendant's response to the allegations. *Id.* Five days later, KTVU published an article that included a section regarding sexual abuse allegations against an "Officer S." also known as "Dirty Dick." Attached at Exhibit 4. The article referenced Marie, Aimee, and a third inmate, Linda, who claimed that "Officer S" abused them. *Id.* The article noted that "Officer S" denied the allegations. *Id.* The government has not located additional contemporaneous communications between the Defendant and KTVU but found a screenshot on the Defendant's phone of an email that he wrote to ABC News seeking retraction of a story discussing sexual abuse allegations against him. Attached at Exhibit 5. In the email, the Defendant wrote, "I have not been charged and as far as I know not under any investigation. I have 20 years as a Correctional Worker and to hear about these claims from a media source first is deeply troubling." *Id.* On June 28, 2022, FCI Dublin Union President Ed Canales, who testified on the Defendant's behalf at the first trial, called the Defendant and left him a voicemail message stating, "Hey, Smith. It's Canales. Hey, I don't know if you know but they did a whole article on you and a couple other people, so give me a call. And then they read whatever email you sent, bro. That was a bad idea. So, give me a call."[1]

The government cannot confirm whether this was, in fact, the first time that Defendant learned of allegations against him, but based on these documents, no later than June 23, 2022, he knew that at least three inmates claimed he abused them and at least one of those inmates filed a civil tort claim with the BOP seeking financial compensation.

The Defendant periodically searched for and saved news articles related to investigations of FCI Dublin. *See e.g.* Exhibit 8 (screenshot of KTVU article titled, "Dozens of Women Detail Rape Allegations" and Exhibit 11 (screenshot of Google News search for "FCI Dublin news").

**B.    Defendant Tracked the Progress of FCI Dublin Investigations.**

Following the publication of the KTVU article and throughout the next eleven months until his arrest, the Defendant repeatedly sought out information about the status of officer investigations at FCI Dublin. During this time, the Defendant lived in Florida where he relocated after

---

[1] The voicemail is a digital file that will be provided to the Court separately.

December 18, 2021, the last time that he worked on-site at FCI Dublin. Text messages with several FCI Dublin officers show that the Defendant on about a monthly basis checked in with guards still working at the prison to get updates on what was happening there. For example, on August 23, 2022, he messaged Officer I.V. and asked, "[W]hat's the latest[?]" I.V. informed the Defendant of additional officers who had been "walked off" the prison grounds. Attached at Exhibit 6 at SMITH-003171[2]. The same day, the Defendant exchanged messages with Officer M.O. The Defendant asked, "Has anyone else even spoken with investigators other than Chavez[?]" Attached at Exhibit 7 at SMITH-003123.[3] On October 26, 2022, the Defendant asked Officer I.V., "What's the latest rumors[?]" He went on to say, "Trying to get a feel for the environment and what the latest gossip is at FCI Drama." Exhibit 6 at 003175, 003177. Two days later, the Defendant texted Officer M.O. and asked, "Has anyone contacted you yet[?]" Exhibit 7 at SMITH-003125.

Throughout the next many months, the Defendant repeatedly referenced officers speaking with investigators and cooperating with the Federal Bureau of Investigation. For example, during a text message conversation with Officer M.O. in February 2023, the Defendant noted that evidence regarding Enrique Chavez referenced statements made by another officer with the initials "A.J." who the Defendant assumed was "Jones." Exhibit 7 at SMITH-003132. On, April 5, 2023, the Defendant wrote in a text message to Officer J.B, "I heard Jones from food service is talking to FBI cutting deals…" Exhibit 10 at SMITH-003025.[4]

In addition to Chavez, screenshots on the Defendant's phone and his text conversations show that the Defendant tracked the prosecutions of other FCI Dublin guards. Two weeks after a U.S.

---

[2] The full set of text messages exchanged between the Defendant and Officer I.V. was previously marked (but not offered for admission) at Trial Exhibit 271. The redacted messages attached here are excerpts relevant to the chronology summarized above. The government can provide a full unredacted set of the messages should the Court wish to review.

[3] The full set of text messages exchanged between the Defendant and Officer M.O. was previously marked (but not offered for admission) at Trial Exhibit 268. The redacted messages attached here are excerpts relevant to the chronology summarized above. The government can provide a full unredacted set of the messages should the Court wish to review.

[4] The full set of text messages exchanged between the Defendant and Officer J.B. was previously marked (but not offered for admission) at Trial Exhibit 265. The redacted messages here are excerpts relevant to the chronology summarized above. The government can provide a full unredacted set of the messages should the Court wish to review.

Magistrate Judge signed a Criminal Complaint against Warden Ray Garcia, the Defendant saved a screenshot of the DOJ press release announcing the charges. Attached at Exhibit 1; *see also* Exhibit 2 (screenshot of first page of Garcia Complaint). He later saved a screenshot of a news article regarding the government's response to Garcia's motion for a new trial. Attached Exhibit 16. In his conversations with other officers, the Defendant discussed Chavez's guilty plea and the then-pending trial of Bellhouse. *See e.g.* Exhibit 6 at SMITH-003182; Exhibit 10 at SMITH-003100-101.

The Defendant also tracked government investigations beyond the criminal prosecutions. On December 13, 2022, he texted Officer I.V., "Tomorrow a 9 month investigation is released to the Senate Judiciary Committee about Dublin mostly. I am trying to see how I can stream it." Exhibit 6 at SMITH-003204.

### C. Defendant Conducted Internet Searches for Information Regarding One of His Accusers.

During this same time period, the Defendant ran web searches for personal information regarding Aimee, one of the FCI Dublin inmates accusing him of sexual abuse. In December 2022, nearly six months after learning of her accusations, the Defendant searched for Aimee through the online BOP inmate locator. Attached at Exhibit 12. Two months later, in February 2023, he saved screenshots of a *New York Times* article titled, "Justice Dept. Struggles to Carry Out Early Release Program for Abused Inmates." Attached at Exhibit 14. The article referenced allegations by Aimee and her petition for compassionate release. *Id.* The article said there was "an open federal criminal investigation into a male employee who is believed to have abused [Aimee] and other inmates…" *Id.* The following day, the Defendant searched for Aimee's full name in idcrawl.com and clustrmaps.com, online aggregators of personal information. Attached at Exhibit 15. He saved screenshots of these results on his phone. *Id.*

### D. Defendant Purchased Professional Liability Insurance in November 2022.

While tracking developments regarding the prison, in November 2022 the Defendant purchased professional liability insurance, which provided coverage for both civil and criminal claims. *See* attached at Exhibit 9. He asked Officer M.O. for the name of an insurance company that M.O. previously referenced. The Defendant wrote, "Just settled all my cases so I'm signing up[.]" Exhibit 7 at SMITH-003127-29.

### E. Defendant Bought and Sold Assets in 2022 and 2023.

Throughout 2022 and 2023, the Defendant and his wife bought and sold significant assets.

In July 2022, one month after learning of the allegations against the Defendant, a property in Wakulla County, Florida was purchased for $70,000 and registered in the name of the Defendant's wife, Carla Marie Sisi Smith. Attached at Exhibit 13. Unlike other property purchases that included the Defendant as an owner or was owned by the Smith's joint LLC (Beach-N-View LLC), this purchase was in Mrs. Smith's name alone.

In October 2022, the Defendant purchased a Shelby Super Snake Mustang with a manufacturer's retail price of $146,150.00. *See* Exhibit 6 at SMITH-003178-81.

The following year, in March 2023, two months prior to his arrest, the Defendant sold a condo for $980,000. Attached at Exhibit 25. He told Officer J.B. via text message, "[S]old my beachfront home today and freed up some cash." Exhibit 10 at SMITH-002990. He also told J.B. that he sold his tractor. The photograph attached to the text message advertised the sale of a John Deere tractor for $49,996.00. Later that month, the Defendant saved a screenshot of his government retirement account, reflecting a balance of $226,295.57. Attached at Exhibit 17.

### F. After Learning of Potential Civil Lawsuits, Defendant and His Wife Filed for Divorce.

Messages show that on May 9, 2023, two days prior to his arrest, the Defendant learned from another guard that civil lawyers for FCI Dublin victims planned on filing lawsuits against guards. Exhibit 10 at SMITH-003109-111. The Defendant shared this news with another FCI Dublin officer. Exhibit 7 at SMITH-003161-62. The following day, May 10, 2023, the Defendant and Mrs. Smith filed for a Simplified Dissolution of Marriage in Wakulla County, Florida. Attached at Exhibit 20. The couple filed a handwritten rider outlining an agreed upon division of assets. *Id.*

Under that agreement, the Defendant received, amongst other items, a gun collection, coin collection, the Mustang, another vehicle and trailer, his retirement account, a USAA account listed at $20,000, a Navy Federal account listed at $1,000, and the cash value of unspecified life insurance accounts. *Id.* Mrs. Smith received, amongst other items, the couple's primary and secondary homes in Crawfordville, Florida; 29 parcels of land at Seaside Cottages in Eastpoint, Florida; 10 acres of land in

Panacea, Florida; two vehicles and a utility trailer; a Citi account listed at $75,000; and "[a]ll stock investments" listed at $100,000. *Id.*

On May 11, 2023, the day after the divorce filing, agents arrested the Defendant and searched his primary home in Florida.

The basis for the divorce appears to be, at least in part, motivated by a desire to shield the Smiths' collective assets from potential creditors or criminal sanctions. At 10:29 p.m. on the evening before Mrs. Smith's testimony, defense counsel emailed the government notes of their interview of Mrs. Smith. The notes contained the following: "Divorced in 2023 because it was best for my career and our family. I needed to keep my job. News reports about Dublin and DD had come out. Right before the raid." Attached at Exhibit 26. Mrs. Smith's comments directly link the divorce to the Dublin investigation and reports of the nickname "Dirty Dick."[5] Similarly on the stand, when questioned by defense counsel about the couple's decision to move properties into her name alone, Mrs. Smith testified as follows:

> Q. So why were the properties transferred into your name?
> 
> A. It was just a better financial decision for us.
> 
> Q. And why would that be?
> 
> A. There's a lot going on right now with the aspect and the craziness of Dublin, and news articles were coming out, and we just felt that it was best to have everything in my name.
> 
> Q. Do you and Darrell still live together?
> 
> A. We do.

Trial Tr. Vol XI, 1953:21 – 1954:3. A claim now by the Smiths that the property transfers were simply to effectuate a divorce that pre-dated the Defendant's indictment overlooks the direct connection Mrs. Smith herself made under oath between the divorce, the family's finances, and the FCI Dublin investigation. Moreover, despite the purported divorce, Mrs. Smith admitted in her testimony that she and the Defendant continue to live together, and she has attended both of the Defendant's trials this year

---

[5] After receiving the interview notes, federal agents attempted to locate a divorce filing involving the Defendant and were unable to locate one prior to Mrs. Smith's testimony. As of the close of evidence, the government could not confirm the statement in the interview notes.

and elected to testify in the retrial.

Finally, and as outlined during Mrs. Smith's testimony, the Smith's executed quit claim deeds transferring ownership into Mrs. Smith's name shortly after the return of the initial criminal Indictment and the First Superseding Indictment. On June 12, 2023, one month after his arrest, the Defendant transferred the couple's primary residence from his name into Mrs. Smith's name. Attached at Exhibit 21. The following month, on July 10, 2023, the couple transferred ownership of their secondary home from their joint LLC into Mrs. Smith's name. Attached at Exhibit 22.

A federal grand jury returned a Superseding Indictment on July 25, 2024. The following month, on August 26, 2024, the Smith executed quit claim deeds transferring 29 properties from being held in their names jointly into Mrs. Smith's name. Attached at Exhibit 23. This transfer occurred a year and a half after the divorce filing.

### G. Defendant Engaged in Significant Financial Transactions After Being Charged Criminally.

Following his arrest and the filing of the CJA financial affidavit in this case, the Defendant and Mrs. Smith continued to engage in significant financial transactions in cash. On October 3, 2024, the Defendant withdrew $79,000 in cash from an account at Centennial Bank. Attached at Exhibit 24. The cash was withdrawn over the course of one day from five different branch locations. *Id.* Based on his financial affidavit, the amount withdrawn would be approximately half of his available cash or savings.

Federal agents have reviewed financial reports indicating that earlier this year, in February 2025, Mrs. Smith withdrew $13,000 in cash from a Wells Fargo account. Shortly after the first trial, in June 2025, Mrs. Smith purchased two Toyota vehicles, for a total purchase price of $96,427. Of that amount, $51,460 was paid in cash. The government offers this information by way of proffer at this time as it awaits underlying documentation regarding these two transactions.

### IV. CONCLUSION

Based on the documents reviewed by the government to date, the Defendant may have misled the Court with respect to his finances in his initial CJA affidavit and when he sought appointed counsel. The government has not identified anything in the documentary record showing a significant change in the Defendant's financial circumstances on or around April 2024 as asserted by defense counsel in

1 | relation to a motion to withdraw.

2 | DATED: October 6, 2025                              Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

             /s/
ANDREW J. PAULSON
SAILAJA M. PAIDIPATY
Assistant United States Attorneys